IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAWN W. LAMB, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 12-137 |
| v. | ) |
| | ) Judge Donetta W. Ambrose |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

September 24, 2013

I. **INTRODUCTION**

Dawn W. Lamb ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). This matter comes before the Court on cross motions for summary judgment. (ECF Nos. 11, 13). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on July 22, 2009, claiming a disability onset of January 1, 2006. (R. at 109 – 19, 147).[1] She claimed that her inability to work full-time allegedly stemmed from rheumatoid arthritis, lupus, Barrett's esophagus, insomnia, fatigue, migraines, celiac disease, anxiety, depression, allergies, sinus problems, anemia, low white blood cell count, sensitivity to light and noise, cysts on ovaries, joint swelling, indigestion, and vision problems. (R. at 152). Plaintiff was initially denied benefits on January 11, 2010. (R. at 96 – 105). Per the request of Plaintiff, an administrative hearing was held on December 2, 2010. (R. at 47 – 74). Plaintiff appeared to testify, represented by counsel, and a neutral vocational expert also testified. (R. at 47 – 74). In a decision dated January 13, 2011, the ALJ denied Plaintiff the benefits sought. (R. at 13 – 28). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, but this request was denied on April 30, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed her Complaint in this Court on June 14, 2012. (ECF No. 1). Defendant filed an Answer on August 17, 2012. (ECF No. 8). Cross motions for summary judgment followed. (ECF Nos. 11, 13). The matter has been fully briefed, and is ripe for disposition.

## III. STATEMENT OF FACTS

### A. General Background

Plaintiff was born on June 13, 1969, was thirty nine years of age at the time of her application for benefits, and forty one years of age at the time of the ALJ's decision. (R. at 147). Plaintiff graduated from high school, and completed a course of vocational training for cosmetology. (R. at 158 – 59). Plaintiff was separated from her husband and lived in her own home. (R. at 55, 168). Plaintiff had two sons, one of which died of leukemia around 2006. (R.

---

[1] Citations to ECF Nos. 9 – 9-19, the Record, *hereinafter*, "R. at __."

at 55, 552). She was the primary caretaker of her surviving teenage son. (R. at 55). Plaintiff was capable of independent self-care, but had difficulty putting on clothes and washing her hair, because of left shoulder pain, and using buttons and zippers, because of swelling in her hands. (R. at 56 – 57, 169). She was capable of cooking, vacuuming, cleaning laundry, and shopping. (R. at 56, 66 – 67, 170). Plaintiff stretched and exercised. (R. at 168). Her son assisted her with chores involving heavy lifting, such as trash removal, carrying laundry, and carrying grocery bags. (R. at 56, 67). Plaintiff maintained a driver's license and could travel independently. (R. at 171). Beginning in 2010, Plaintiff had resumed employment at a local hotel on a part-time basis. (R. at 53 – 54). She was in charge of the breakfast buffet one or two days per week, for approximately four hours each day. (R. at 53 – 54, 56). Plaintiff otherwise subsisted on support payments, and received medical assistance from the state. (R. at 56, 151).

    B. <u>Physical Treatment History</u>

On July 15, 2008, Plaintiff was examined for complaints of nonspecific arthralgias at the UPMC Arthritis and Autoimmunity Center in Pittsburgh, Pennsylvania. (R. at 329 – 32). Plaintiff was evaluated by Douglas W. Lienesch, M.D. and Surabhi Agarwal, M.D. At the time, Plaintiff had no fibromyalgia tender points, muscle strength was full, there was no obvious synovitis in the joints, wrist squeeze test was negative, and Plaintiff's joints were cool to the touch. (R. at 331). Diagnostic testing was nonspecific to any particular autoimmune disorder. (R. at 331 – 32). This was largely consistent with prior visits to the center in May and July 2008, one of which indicated that her pain was out of proportion to her physical examination. (R. at 342 – 51). The lack of improvement in Plaintiff's symptoms with the use of prednisone and immunosuppressive agents militated against the finding of inflammatory arthropathy. (R. at 331). A change in medication was made, and Plaintiff was to follow up in several months. (R.

at 331 – 32).

On September 11, 2009, Plaintiff's treating rheumatologist, Theresa Fryer, M.D., noted that Plaintiff had inconsistent diagnostic testing results for autoimmune disorders such as rheumatoid arthritis, and Plaintiff continued to complain of chronic pain. (R. at 324). Plaintiff's treatment history included notations of cold hands and feet, hand swelling and pain, some ankle swelling and pain, and some joint tenderness, as well as general unresponsiveness to medication. (R. at 325 – 28, 333 – 38, 341, 352 – 54, 360, 363 – 64). Due to the inconsistency of diagnostic blood tests, and given the largely normal diagnostic imaging results, specialists believed that Plaintiff had a number of autoimmune or potential autoimmune phenomenon, without a clear diagnosis. (R. at 324, 374, 376 – 77). Plaintiff's complaints remained unchanged despite ongoing medication management. (R. at 324). Dr. Fryer was unsure of how to treat Plaintiff's complaints. (R. at 325).

On December 11, 2009, Plaintiff returned to see Dr. Fryer. (R. at 683). Plaintiff was complaining of pain radiating down her arms. (R. at 683). Diagnostic imaging revealed mild degenerative changes in the cervical spine. (R. at 685). Plaintiff had been referred to physical therapy, but had not seen any relief after one week. (R. at 683). Plaintiff still noted pain in her elbows, hands, knees, and ankles. (R. at 683). Plaintiff had no synovitis or neurological deficits. (R. at 683). Plaintiff returned to Dr. Fryer on February 4, 2010. (R. at 670). Her biggest complaint was her knees. (R. at 670). In the past, the pain was mild, but recently it had worsened and included some swelling. (R. at 670). Dr. Fryer provided an injection for pain. (R. at 670).

Plaintiff was under the care of Suresh S. Shah, M.D. for mild leukopenia and anemia. On February 8, 2010, Dr. Shah noted that Plaintiff had a coordinated and smooth gait, her digits

were without cyanosis or clubbing, and she had no gross motor or sensory deficits. (R. at 668). On February 11, 2010, Dr. Lienesch noted that Plaintiff experienced polyarthralgia, but the cause was unknown. (R. at 666). He categorized her pain as undifferentiated connective tissue disease. (R. at 666). Plaintiff had not responded to an array of immunosuppressive agents. (R. at 666). Plaintiff had no synovitis, but tenderness was found around several joints. (R. at 665). Plaintiff had full strength, but fibromyalgia tender points around the neck and shoulder girdle were observed. (R. at 665).

On March 19, 2010, Dr. Fryer noted that Plaintiff's knee pain had improved tremendously after her injections. (R. at 662). Dr. Fryer also injected Plaintiff's shoulder muscles due to tightness and discomfort with rotation of the neck. (R. at 662). Plaintiff's knees were again injected on May 7, 2010. (R. at 659). Seeing a chiropractor had also helped Plaintiff's pain. (R. at 659).

Plaintiff was examined by Dr. Fryer on September 13, 2010. Dr. Fryer diagnosed Plaintiff with fibromyalgia, and provided injections for her knee pain. (R. at 657). Plaintiff had been in physical therapy for three months for cervical and shoulder pain, to no effect. R. at (R. at 657). She was having difficulty reaching backwards and up. (R. at 657).

C. Mental Treatment History

Plaintiff began treatment at Safe Harbor Behavioral Health ("Safe Harbor") in Erie, Pennsylvania, on December 20, 2007. (R. at 471). Plaintiff was diagnosed with major depressive disorder, complicated by bereavement, following the death of her son. (R. at 471). She was also suspected of suffering impulse control disorder. (R. at 471). Plaintiff had difficulty with obsessive thoughts and being around others. (R. at 471). Her marriage was also beginning to dissolve. (R. at 471). Plaintiff was prescribed Remeron, Trazadone, Adderall, and

Clomipramine for treatment. (R. at 471). She was assigned a global assessment of functioning score ("GAF") of 46[2]. (R. at 471).

Plaintiff returned to Safe Harbor on March 26, 2008. (R. at 472). She was very well-groomed and dressed, but had gained weight, had compulsive behaviors and difficulty controlling eating, and obsessive thoughts about death and her deceased son. (R. at 472). Her sleep had improved somewhat. (R. at 471). Her physical issues were taking a toll on her mental health. (R. at 472). Plaintiff's diagnoses remained the same. (R. at 472). Her GAF score was 44. (R. at 471).

Plaintiff continued with medication management at Safe Harbor through October 11, 2010. (R. at 473 – 95, 787 – 97, 814). She continued to have the same issues, with some improvement in thoughts of death, some improvement in her self-esteem, and increases in exercise. (R. at 473 – 95). GAF scores typically ranged from 45 – 48. (R. at 473 – 95). Plaintiff's diagnoses also came to include attention deficit hyperactivity disorder and obsessive-compulsive disorder. (R. at 473 – 95). Therapy, in addition to ongoing medication management, was suggested, but Plaintiff did not wish to engage in therapy because she did not believe that it would help. (R. at 477, 483, 485, 487, 490, 493).

At an appointment at Safe Harbor on October 7, 2009, Plaintiff was assigned a GAF score of 60[3]. (R. at 494). She was observed to be alert and oriented, anxious, not suicidal, not delusional or paranoid, not hallucinating, and with good insight, judgment, and impulse control.

---

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

[3] An individual with a GAF score of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

(R. at 493). Her affect and mood were congruent. (R. at 493). Following that time, Plaintiff's GAF scores typically ranged between 55 and 60. She was typically alert and oriented, and was groomed and dressed appropriately, and she had clear and coherent speech, "ok" or euthymic mood, coherent and appropriate thought, good insight, impulse control, and judgment, and congruent mood and affect. (R. at 787 – 97).

    D. <u>Functional Capacity Evaluations</u>

On November 13, 2009, consultative examiner Lamar Neal, Psy.D. completed a psychological evaluation of Plaintiff on behalf of the Bureau of Disability Determination. (R. at 552 – 60). Dr. Neal noted that Plaintiff drove herself to the evaluation. (R. at 552). Plaintiff was stocky, ambulated slowly, had "fair" hygiene and grooming, "somewhat unkempt" hair, and "mildly disheveled" clothing. (R. at 552). Plaintiff informed Dr. Neal that she had lupus, rheumatoid arthritis, ulcers, insomnia, vitiligo, allergies, and joint pain. (R. at 552). She claimed to be tearful and depressed, and had difficulty controlling her mood. (R. at 552 – 53). Plaintiff stated that she was often overwhelmed, and that she sometimes remained in bed all day. (R. at 552 – 53). Being in crowded public places made Plaintiff anxious. (R. at 553). Her anxiety medication effectively calmed her, however. (R. at 553). Plaintiff's mood was affected by chronic pain of 6-7/10. (R. at 553). Dr. Neal recorded that Plaintiff had an inconsistent outpatient mental health treatment history. (R. at 553). Plaintiff had never been hospitalized for her mental health. (R. at 553). At that time, Plaintiff admitted that she had not been to therapy since 2008; although, she had recently been advised to seek therapy. (R. at 553).

In terms of her work history, Plaintiff stated that she worked for fifteen years as a waitress and server at a local Bob Evans restaurant. (R. at 555). She had stopped working "due to her extended family medical issues." (R. at 555). Plaintiff described a "good work history,"

7

that did not include job reprimands or termination. (R. at 555). Her only reported source of income, at the time, was food stamps and child support payments. (R. at 555). At home, Plaintiff was able to manage her finances and bills independently, and cooked and cleaned. (R. at 555). She explained that she received some help from family members. (R. at 555).

During his mental status examination, Dr. Neal observed that Plaintiff was alert and oriented, her speech was fluent, if somewhat slow and deliberate, she was easily distracted, she appeared somewhat confused, her thought processes were mildly disjointed, she had difficulty following the flow of conversation, and her motor movements were slow and deliberate. (R. at 555). Dr. Neal also noted that Plaintiff was "somewhat easily confused," with "poor focus and attention." (R. at 554). Plaintiff stated that she had graduated from high school in 1989, when she actually graduated in 1987. (R. at 555). She was of low-average intellectual ability, was easily overwhelmed by questioning, and had poor persistence and no frustration tolerance. (R. at 556). Plaintiff had some cognitive deficits. (R. at 556). Plaintiff's insight into her psychological issues was "quite limited." (R. at 556).

Dr. Neal diagnosed Plaintiff with chronic post-traumatic stress disorder ("PTSD"), generalized anxiety disorder, panic disorder without agoraphobia, and recurrent, severe major depressive disorder. (R. at 557). Plaintiff was assigned a GAF score of 45. (R. at 557). Plaintiff's prognosis was "extremely guarded." (R. at 557). Plaintiff was indicated to have marked-to-extreme limitation in all areas of functioning, except her ability to interact with the public, for which she was only moderately limited. (R. at 559).

On November 20, 2009, state agency evaluator Sharon Becker Tarter, Ph.D. completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. at 585 – 88). Following a review of the medical record, Dr. Tarter concluded that the evidence supported

finding impairment in the way of affective disorders, anxiety-related disorders, and personality disorders. (R. at 585). As a result, Plaintiff would be markedly limited interacting appropriately with the general public. (R. at 586). In all other functional areas, Plaintiff was not significantly or only moderately limited. (R. at 585 – 86). Regardless, Dr. Tarter believed that Plaintiff was capable of full-time employment. (R. at 587 – 88). Dr. Tarter opined that Plaintiff could understand and remember simple one and two step instructions, carry out very short and simple instructions, maintain socially appropriate behavior, perform personal care functions, sustain an ordinary routine and adapt to routine changes, and perform repetitive work activities without constant supervision. (R. at 587). Dr. Neal's findings were considered to be an overestimate of Plaintiff's limitations based upon a "snapshot" of Plaintiff's functioning. (R. at 587).

On January 7, 2010, state agency evaluator Paul Fox, M.D. completed a Physical RFC assessment of Plaintiff. (R. at 578 – 84). Based upon a review of the medical record, Dr. Fox determined that Plaintiff experienced polyarthralgias, lupus anticoagulant, migraine, mild chronic anemia, mild chronic leukopenia, photosensitivity, and vitiligo. (R. at 578). As a result, Plaintiff was expected to lift and carry no more than twenty pounds occasionally and ten pounds frequently, stand or walk at least two hours of an eight hour work day, sit six hours, only occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds, and avoid exposure to extreme heat and cold. (R. at 579 – 81). Plaintiff's personal claims of pain and limitation were found to be only partially credible, because Dr. Fox believed the medical record revealed that Plaintiff received various forms of treatment through a variety of specialists, and was generally successful in controlling her physical symptoms. (R. at 583 – 84). Plaintiff was capable of caring for personal needs, performing routine household activities, and driving an automobile. (R. at 584).

On November 3, 2010, Dr. Fryer completed a Physical RFC Questionnaire regarding Plaintiff's functional abilities. (R. at 833 – 37). Dr. Fryer noted that she had been treating Plaintiff every two to four months since January 2007 for cervical spondylosis, osteoarthritis of the knee, fibromyalgia, left shoulder polyarthralgia, and possible inflammatory arthritis in the hands. (R. at 833). Plaintiff's conditions were considered to be chronic, and "won't get better." (R. at 833). Plaintiff's pain was believed to be exacerbated by her mental health issues, and would frequently interfere with her attention, concentration, and ability to perform simple work tasks. (R. at 834).

Dr. Fryer opined that Plaintiff could walk one city block, could sit no more than thirty minutes at a time, and could stand no more than twenty minutes at a time. (R. at 834). During an eight hour work day, Plaintiff could stand and walk no more than two hours, and could sit no more than four hours. (R. at 835). Plaintiff would need to take at least one unscheduled break per day for thirty to sixty minutes. (R. at 836). Plaintiff could rarely lift less than ten pounds, and could never lift more than ten. (R. at 836). Plaintiff could not look down or up, or hold her head in a static position, and could only occasionally turn her head left and right. (R. at 836). She could occasionally twist and stoop, but could climb stairs only on rare occasions, and could never climb ladders or crouch/squat. (R. at 836). Plaintiff could not use her hands or arms for more than ten percent of the work day, or use her fingers for more than twenty-five percent. (R. at 836). Plaintiff would be expected to miss at least four days of work per month. (R. at 836). Dr. Fryer indicated that Plaintiff had been experiencing this degree of limitation since January 2007. (R. at 837).

E.  Administrative Hearing

In response to questioning by the ALJ, Plaintiff testified that at the time of her hearing

she was working a part-time job managing a hotel breakfast buffet. (R. at 52). Plaintiff worked one or two days per week, for approximately three-and-one-half to for hours per day. (R. at 52). Her job required Plaintiff to monitor the scrambled eggs, sausage, donuts, and other items available for breakfast. (R. at 53). If the eggs or sausage ran out, Plaintiff was tasked with cooking and replacing the items. (R. at 53). Plaintiff generally worked alone. (R. at 53). She would carry up to five pounds, and drove herself to work. (R. at 54).

Plaintiff testified that she could walk for no longer than fifteen minutes due to muscle pain, and could sit for no longer than twenty. (R. at 57). She had issues with putting on clothing and bathing because of left shoulder and hand pain. (R. at 57). Physical therapy had not helped relieve these limitations. (R. at 58). Plaintiff did not believe that she could work more than four hours per day due to her pain and swelling, particularly in her joints and hands. (R. at 60 – 61, 63, 67). At her current job, Plaintiff spent approximately forty five minutes of that time sitting. (R. at 60). The rest was spent on her feet. (R. at 61). Her pain worsened as the day went on. (R. at 61).

From a mental standpoint, Plaintiff testified that her current job could easily overwhelm her, and she had difficulty paying attention. (R. at 61, 69). She stated that she had conflict with other co-workers and her supervisor due to forgetting to properly clean after her shift. (R. at 61 – 62). Plaintiff claimed that she also had arguments with co-workers and supervisors at her prior full-time job, and had even been sent home when confronting managers about how they were running the business. (R. at 62 – 63).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would be eligible for a significant number of jobs in existence in the national economy if limited to light

work involving lifting and carrying no more than ten pounds frequently and twenty pounds occasionally, standing and walking six hours of an eight hour work day, sitting eight hours, and allowing for alternating between sitting and standing at-will, with no climbing, no reaching overhead, no pushing or pulling more than ten pounds occasionally, and no interaction with the general public. (R. at 71). The vocational expert responded that such a person would be capable of working as a "mail sorter," with 170,000 positions available in the national economy, and as a "laundry sorter," with 500,000 positions available. (R. at 71).

Plaintiff's attorney then asked the vocational expert whether a hypothetical person who is unable to lift more than ten pounds, reach no more than ten percent of an eight hour work day, finger no more than twenty-five percent, and grasp no more than ten percent, could perform full-time work. (R. at 72). The vocational expert replied that no jobs would be available to such a person. Plaintiff's attorney went on to ask whether an individual who is unable to stand and walk more than two hours of an eight hour work day, and unable to sit more than four hours, would be eligible for full-time work. (R. at 72). The vocational expert responded in the negative. (R. at 72).

The vocational expert also explained that the customary expectation for an employee to be on-task during the work day was eighty five to ninety percent. (R. at 73). An employee could miss no more than two days of work per month to maintain employment. (R. at 73). Further, if unable to understand, remember, or carry out simple instruction, a hypothetical person could not engage in full-time work. (R. at 73).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; *Schaudeck v.*

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

13

*Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

---

[5] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

## V. DISCUSSION

In his decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of polyarthralgias, connective tissue disease, recurrent, severe major depression, and anxiety disorder. (R. at 19). As a result, Plaintiff was determined to be limited to light work, lifting and carrying up to ten pounds frequently and twenty pounds occasionally, standing and walking for six hours of an eight hour work day, sitting for eight hours, pushing and pulling occasionally at weights no greater than ten pounds, only simple repetitive 1, 2, and 3-step tasks, non-production rate setting, the ability to switch between sitting and standing, at-will, and no repetitive overhead reaching, climbing, or frequent interaction with the general public. (R. at 23). Based upon the testimony of the vocational expert, the ALJ nonetheless concluded that with such limitations Plaintiff was still eligible for a significant number of jobs in existence in the national economy. (R. at 27 – 28). Plaintiff was, therefore, denied DIB and SSI. (R. at 28).

Plaintiff objects to the ALJ's decision, arguing that he erred in failing to give controlling weight to the findings of Dr. Fryer, in failing to adequately explain his rejection of the findings of Dr. Neal, and in failing to incorporate all of the findings of Dr. Tarter into his RFC and hypothetical question. (ECF No. 12 at 7 – 13). Defendant counters that the ALJ's decision was supported by substantial evidence from the record, and should be affirmed. (ECF No. 14 at 11 – 18). The court agrees with Defendant.

Plaintiff first argues that the ALJ failed to give due weight to Dr. Fryer's RFC assessment. (ECF No. 12 at 7 – 10). The court notes that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell*

15

*v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F. 2d 1348, 1350 (3d Cir. 1987)). However, "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)). The determination of disabled status for purposes of receiving benefits – a decision reserved for the Commissioner, only – will not be affected by a medical source simply because it states that a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Further, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Brownawell*, 554 F. 3d at 355. Moreover, a medical opinion is not entitled to any weight if unsupported by objective evidence in the medical record. *Plummer*, 186 F. 3d at 430 (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)).

In his decision, the ALJ adopts some of Dr. Fryer's findings in whole, adopts others in part, and rejects the rest. (R. at 26). The ALJ supported his decision to reject the more restrictive sitting, standing, walking, lifting, climbing, reaching, fingering, and grasping limitations based upon a combination of objective medical evidence, as well as Plaintiff's reported physical activities. The ALJ first cited to findings by Drs. Shah and Lienesch indicating that despite Plaintiff's complaints, she had normal gait, no clubbing or cyanosis, no gross *motor* or *sensory* deficits, no synovitis, and full muscle strength. (R. at 23). He also cited to the opinion of Dr. Fox, and largely adopted his milder limitations findings, in addition to those he accepted from Dr. Fryer's RFC. (R. at 25). Finally, the ALJ looked at Plaintiff's activities, including her part-time job and attendant job duties, notations from Safe Harbor that Plaintiff

exercised frequently, Plaintiff's own activities of daily living, and the subjective complaints made by Plaintiff for disability purposes – but not found to the same degree within her objective medical record. (R. at 24 – 26). While the ALJ did not doubt that Plaintiff experienced significant limitation due to her conditions, he concluded that Dr. Fryer's RFC was out of proportion to what was recorded in the objective medical notes, as was his duty.

In cases such as the one at present, "when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them." *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981). The ALJ must provide an explanation supported by substantial evidence to justify the rejection of pertinent evidence. *Fargnoli v. Massanari*, 247 F. 3d 34, 43 (3d Cir. 2001). However, the court must stress that substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F. 3d 501, 503 (3d Cir. 2004). Here, the ALJ's discussion of the medical evidence, and his partial reliance upon the findings of Dr. Fox, were adequate to justify giving diminished weight to Dr. Fryer's RFC. *Chandler*, 667 F. 3d at 361 ("State agent opinions merit significant consideration"). Substantial evidence supported his decision, in this respect.

Plaintiff next argues that the findings of consultative examiner Dr. Neal were not properly credited by the ALJ. (ECF No. 12 at 10 – 12). The ALJ noted the marked and extreme limitations findings, and low GAF score, assessed by Dr. Neal in his decision. (R. at 25 – 26). The ALJ found – as did Dr. Tarter – that these findings were inflated, and not an accurate representation of Plaintiff's mental health history. (R. at 25 – 26). In support of his position, the

ALJ cited to Plaintiff's psychiatric treatment at Safe Harbor between October 2009 and October 2010, which revealed a marked – and sustained – increase in Plaintiff's GAF scores, as well as improved mental functioning. (R. at 23). Observations by Dr. Neal about Plaintiff's appearance were at odds with those at Safe Harbor, as was the anomalous diagnosis of PTSD. (R. at 26). Further, Dr. Tarter concluded based upon her evaluation of the medical record, that Dr. Neal's findings were out of proportion to what was found in Plaintiff's mental treatment history. (R. at 25). Her limitations findings did not exclude Plaintiff from finding work. (R. at 25). The court, therefore, finds that the ALJ adequately supported his decision to accord Dr. Neal's findings diminished weight with substantial evidence from the medical record, particularly the lengthy treatment record from Safe Harbor, the latter portion of which revealed significant improvement in Plaintiff's mental status.

Lastly, to the extent that Plaintiff argues that the ALJ erred in failing to accommodate Dr. Tarter's finding of marked limitation with respect to interacting with the public, the ALJ clearly indicated that the work which Plaintiff could sustain would not include frequent interaction with the public. (ECF No. 12 at 12 – 13). Specifically, the ALJ stated that "the claimant has a need to avoid repetitive reaching, any climbing, and *frequent interaction with the general public*." (R. at 23) (emphasis added). As such, Plaintiff's argument is moot.

## VI. CONCLUSION

Based upon the foregoing, the RFC assessment, hypothetical question, and ultimate decision by the ALJ to deny benefits were adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is denied (ECF No. 11), Defendant's Motion for

Summary Judgment is granted (ECF No. 13), and the decision of the ALJ is affirmed. Appropriate Orders follow.

<u>s/ Donetta W. Ambrose</u>
Donetta W. Ambrose
Senior United States District Judge

cc/ecf: George E. Clark, Esq.
Woomer & Hall
2945 Banksville Road, Suite 200
Pittsburgh, PA 15216
(412) 388-0848

Christian A. Trabold, Esq.
United States Attorney's Office
17 South Park Row, Room A330
Erie, PA 16501
(814) 452-2906

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAWN W. LAMB, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 12-137 |
| v. ) | |
| ) | Judge Donetta W. Ambrose |
| CAROLYN W. COLVIN, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER OF COURT

AND NOW, this 24th day of September, 2013, in accordance with the foregoing Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff Dawn W. Lamb's Motion for Summary Judgment [11] is DENIED, Defendant Commissioner of Social Security's Motion for Summary Judgment [13] is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED, pursuant to the fourth sentence of 42 U.S.C. § 405(g).

*s/ Donetta W. Ambrose*
Donetta W. Ambrose
Senior United States District Judge

cc/ecf: George E. Clark, Esq.
Woomer & Hall
2945 Banksville Road, Suite 200
Pittsburgh, PA 15216
(412) 388-0848

Christian A. Trabold, Esq.
United States Attorney's Office
17 South Park Row, Room A330
Erie, PA 16501
(814) 452-2906